Karen FLORES, Plaintiff,

v.

THE CITY OF MOUNT VERNON, Mount Vernon Police Department, Det. Sgt. Mark Hackett, Shield No. 3, Det. Besley, Shield No. 32, P.O. Nyrita Sierra, Shield No. 145, and John Does 1–8, Shield Nos. Unknown, John or Jane Doe 9, Shield No. Unknown, Defendants.

No. 97 CIV. 6144(CM)(GAY).

United States District Court,
S.D. New York.

Jan. 19, 1999.

**440**

Scott Korenbaum, Kupfer Rosen & Herz, New York City, for plaintiff.

Louis Martino, Martino & Weiss, Mt. Vernon, NY, for defendants.

## MEMORANDUM DECISION AND ORDER

McMAHON, District Judge.

ORDER GRANTING PLAINTIFF PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DET. SGT. MARK HACKETT ON HER FIRST, THIRD, AND TENTH CLAIMS FOR RELIEF; AND AGAINST THE CITY OF MOUNT VERNON ON HER NINTH CLAIM FOR RELIEF; DENYING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT; DISMISSING PLAINTIFF'S TENTH AND ELEVENTH CLAIMS WITH RESPECT TO THE CITY OF MOUNT VERNON; AND DISMISSING PLAINTIFF'S FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS IN THEIR ENTIRETY.

Before the Court are Plaintiff's motion for partial summary judgment and Defendants' cross-motion for summary judgment. Plaintiff's motion is granted in part and Defendants' cross-motion is denied.

### I. *Statement of Facts*

The utterly outrageous facts of this matter are not in dispute. Indeed, on the record before me, they come almost entirely from the mouths of the Defendants. They are as follows:

On March 5, 1997, Mount Vernon Police Investigator James Cosenza was approached by a person referred to as Confidential Informant No. 200 (the "CI"). The CI apparently informed Cosenza that persons inside a restaurant known as Friary's Pub were using powdered cocaine. Pursuant to Cosenza's instructions, the CI went to Friary's Pub to purchase

cocaine on March 13, 1997. After he did so, he returned to Cosenza and stated that he had engaged in a conversation with a white male, in his early to mid-fifties, of medium build and fair complexion, approximately 5'-7" to 5'-9" who stated that his name was Shawn. Shawn was said to be the owner of the pub, and indeed proved to be Shawn Frieary, a white male in his early to mid-fifties whose appearance generally conforms to the CI's description. Shawn agreed to sell cocaine to the CI. Shawn left the bar area, went to the back of the premises, returned to his station behind the bar and exchanged a clear ziplock bag containing a white powdery substance for U.S. currency that had been provided by Cosenza.

On March 14, 1997, Cosenza swore out an affidavit for a search warrant based on the CI's report to him. The warrant authorized the Mount Vernon Police Department to search Frieary's Pub for evidence of narcotics and for a person named Shawn who conformed to the CI's description. Nothing in the CI's report to Cosenza, Cosenza's affidavit in support of the application for a search warrant or the search warrant itself made any mention of a Karen Flores, or for that matter any woman. There is no evidence in this record that she was even in Frieary's Pub on March 13, let alone that she was in any way involved in the sale of cocaine to the CI.

Det. Sgt. Mark Hackett, the commander of the Narcotics Unit for the Detectives Division of the Mount Vernon Police Department (the "Narcotics Squad"), decided to execute the warrant on the evening of March 20, 1997. Mrs. Flores, who had worked in the restaurant as a waitress/bartender for some four years, was on duty that evening. Prior to the execution of the warrant, Hackett held a brief meeting to mete out assignments. During that meeting, neither Hackett, Cosenza nor any other member of the Narcotics Squad discussed the contents of the search warrant, the evidence that had led to its issuance, the possibility that firearms might be pres-

ent in the Pub, or the possibility that others besides "Shawn" might be involved in the sale of narcotics. As the Narcotics Squad set out to execute the warrant, not a single member of the team had a shred of evidence linking Mrs. Flores to any illegal activity that might have occurred, or might be occurring, at Frieary's Pub.

The Narcotics Squad entered Frieary's Pub at approximately 9:15 PM on the evening of March 20 and spent about an hour and a half searching the premises. A member of the team immediately detained Mrs. Flores, who was the only employee behind the bar. The officer ordered her to place her hands on the top of the bar, and she did so. Another officer brought her a stool and ordered her to sit with her hands on her lap while the Pub was searched. At all times during the search, Mrs. Flores was seated on the stool, in full view of the members of the team, who were searching the entire premises, including the bar area. The bar was square and had stools around its outside; Mrs. Flores was at all times inside the square.

The search party found no narcotics either on or behind the bar. There was some money on the bar, but Mrs. Flores identified it as tip money, and a member of the team, Officer Paul Puccini, put it in the tip jar for her. He did not believe, and had no reason to believe, that the money was somehow related to the purchase of cocaine. Almost as soon as he came into the Pub, Officer Puccini saw a patron of the bar, Gregory LaGuardia, pick up a packet from the bar which he thought contained cocaine. However, Officer Puccini did not see Mrs. Flores handle that item and, other than the fact that she was working behind the bar, he had no reason to associate her with the packet. A similar packet was later found on the floor adjacent to the bar, but not on the side of the bar where Mrs. Flores was working; it was dropped there by a patron, Peter Zeolla, as observed by Officer James Cosenza. Officer Puccini did not frisk Mrs. Flores, but he did search her pocketbook

(even though he had no warrant authorizing him to search it and no reason to suspect that it contained a weapon that presented a danger to his person). Puccini did not see or hear Mrs. Flores do or say anything that led him to believe that she was involved with any criminal activity, and neither in his deposition nor in his affidavit did he indicate that he believed that she was so involved.

Frieary and three patrons of the Pub were arrested for possession of cocaine shortly after the police entered the Pub. Additional stash (cocaine and marijuana) were found in the basement of the premises, the cocaine in a filing cabinet and the marijuana inside a wall. Puccini informed Sgt. Hackett that his search of the area behind the bar had uncovered no evidence of criminality, and no other member of the Narcotics Squad said anything to Hackett to indicate that Mrs. Flores had committed or was about to commit a crime.

Nonetheless, at the conclusion of the search, Hackett ordered Mrs. Flores arrested. According to Hackett, he made this decision because (1) a number of patrons in the Pub possessed cocaine, (2) the controlled buy that took place a week earlier had been made over the bar (albeit after Frieary had gone into the back room), and (3) the police did not know who had gone to the back room with "Shawn" to get the cocaine a week earlier. *See* Dep. of Det. Sgt. Mark Hackett at 127–28.

At Hackett's order, Mrs. Flores was handcuffed and transported by Officer Besley to Mount Vernon Police Headquarters. Besley did not tell Mrs. Flores that she was being arrested for any crime; rather, he told her she was being taken into the station house to be searched. When they arrived at the station, Besley brought Mrs. Flores into a small, windowless room and asked a female member of the Narcotics Squad, Nyrita Sierra, to come to that room and search Mrs. Flores. Officer Sierra had not been a member of the team that executed the warrant in Frieary's Pub; she received her assignment in the station house, subsequent to Mrs. Flores's arrest. Officer Sierra forced Plaintiff to strip and subjected her to an invasive strip search, including an examination of her genitals and anus. Needless to say, nothing was found on Mrs. Flores's person. She was not charged and was allowed to leave the station house.

Mrs. Flores brought this action against the officers involved in her humiliation. She also sued the City of Mount Vernon, as it has a policy of strip searching every person who is arrested for narcotics-related activity, and she was searched pursuant to that policy. After discovery, both parties moved for summary judgment.

## II. *Legal Analysis*

There is no need to reiterate the familiar standard for granting or denying summary judgment. Suffice it to say that there are no disputed issues of fact in this case; indeed, Plaintiff expressly relies on the testimony of the defendant officers in support of her motion, rather than on her own testimony. The question, then, is purely one of law—did Det. Sgt. Hackett have probable cause to arrest Mrs. Flores on March 20, 1997, at Frieary's Pub? If he did, then Plaintiff's claim fails, because she was subjected to a search incident to a lawful arrest. If he did not, then summary judgment in Mrs. Flores's favor is appropriate as against at least some defendants on her Fourth Amendment claim. *See Wu v. City of New York*, 934 F.Supp. 581, 588 (S.D.N.Y.1996).

### A. *Probable Cause*

Probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. *See Dunaway v. New York*, 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Here, Defendants have the burden

to establish that they had probable cause. *See Raysor v. Port Auth. of New York & New Jersey,* 768 F.2d 34, 40 (2d Cir.1985); *Wu,* 934 F.Supp. at 586. To meet their burden, the police officers must show, by admissible evidence, that they have a quantum of evidence "more than rumor, suspicion, or even a strong reason to suspect." *Wu,* 934 F.Supp. at 586 (quoting *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983)). In our country, arrests cannot be based on mere suspicion. *See Wagner v. County of Cattaraugus,* 866 F.Supp. 709, 714 (W.D.N.Y.1994) (quoting *Papachristou v. City of Jacksonville,* 405 U.S. 156, 159, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972)). As a result, the facts relied upon by an arresting officer must not be susceptible of an innocent or ambiguous explanation. *See Roberts v. City of New York,* 753 F.Supp. 480, 483 (S.D.N.Y.1990). And of course, the mere fact that a person is physically proximate to others who are suspected of criminal narcotics activity does not give rise to probable cause; there must be something more in order for an arrest to be lawful. *See Ybarra v. Illinois,* 444 U.S. 85, 91–93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *see also United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.1990); *United States v. Buschel,* 594 F.Supp. 942, 947 (N.D.N.Y.1984).

■ In this case, the man who made the decision to arrest Mrs. Flores, Det. Sgt. Hackett, explained in great detail what factors underlay his decision. *See* Affidavit of Louis J. Martino ¶ 17. Unfortunately, those factors do not give rise to probable cause to arrest. Taking them one at a time:

Factor No. 1: Half the patrons at the bar were found to be in possession of cocaine. (Hackett Dep. at 127).

Mrs. Flores served food and beverages to individuals who came into a public place owned by someone other than herself. The fact that some of those individuals, or even her boss, had drugs on their person does not even give rise to a reasonable suspicion that she was involved in drug activity, let alone rise to the level of probable cause.

Factor No. 2: When the buy was made from "Shawn" (i.e., Frieary) a week prior to Mrs. Flores's arrest, the money and drugs were physically exchanged over the bar. (Hackett Dep. at 127–28).

The evidence from the previous week's buy certainly gave rise to probable cause to arrest "Shawn" and to obtain a warrant for a search of the bar. However, the police had no evidence that Mrs. Flores was involved in the March 13 transaction; in fact, they had no evidence that she was even in the Pub that night. Therefore, nothing that happened on March 13 gave rise to the slightest suspicion that Mrs. Flores was involved in selling drugs, and Hackett could not rely on anything that happened during the controlled buy to give rise to probable cause just because Plaintiff happened to be working behind the bar seven days later.

Factor No. 3: The police did not know who had gone with "Shawn" into the back of the premises to obtain the cocaine during the controlled buy. (Hackett Dep. at 128).

Actually, this is something of a misstatement. The police did not know IF ANYONE had gone into the back with Shawn on March 13, or was in the back when he left the bar area to obtain the cocaine that he later handed to the CI over the bar. *See* Hackett Dep. at 129. It is sheer speculation on the part of the police to say that anyone accompanied Shawn while he obtained the drugs. Certainly, the police had no reason to know, or even to suspect, that Mrs. Flores was involved with Shawn during the controlled buy; the CI did not mention that a woman had been either present or involved.

Thus, none of the factors that Det. Sgt. Hackett testified he relied on to justify arresting Mrs. Flores gives rise to probable cause. Even taking them together, the Sergeant had no reason to believe that Mrs. Flores had committed or was about

to commit a crime at the time he ordered her arrest.

In an attempt to justify the Sergeant's decision to arrest Mrs. Flores, Defendants contend that probable cause existed because several patrons sitting at the bar when the Squad entered the Pub possessed cocaine, including Karl Genese (who dropped from his possession to the floor a dollar bill containing cocaine), Peter Zeolla (who dropped a zip-lock bag containing cocaine to the floor on the outside of the square bar), and Gregory LaGuardia (who picked up a small bag of cocaine from the bar and put it in his pocket).

Viewing the evidence most favorably to Defendants, the fact that Zeolla and Genese dropped narcotics to the floor when the police entered the Pub does not give rise to probable cause, because it does not admit of an inference that they obtained the drugs from Mrs. Flores, or even that she knew they had contraband on their persons.

This leaves LaGuardia, who allegedly picked up a packet of cocaine from on top of the bar. It might be possible for a trier of fact to infer from this that he had obtained it from the woman behind the bar, although it would require a tremendous inferential leap to reach that conclusion, since (i) it is unsupported by any other evidence (no one saw her do it and no stash was found behind the bar), and (ii) the facts alleged are equally susceptible of an innocent explanation (LaGuardia could well have obtained the cocaine earlier and put the packet on the bar because he planned to ingest it). However, it is not necessary to determine whether such an inference would be warranted, because there is no evidence in this record that Hackett relied on the LaGuardia incident in making the decision to arrest Mrs. Flores. It stands uncontested that Hackett did not see the LaGuardia incident. Officer Puccini did, but Officer Puccini did not make the decision to arrest Mrs. Flores (although he did arrest LaGuardia, whom he saw in possession of cocaine).

Moreover, Officer Puccini did not report to Hackett that Mrs. Flores had been involved in any narcotics activity with Mr. LaGuardia. In fact, Officer Puccini did not see Mrs. Flores give anything to Mr. LaGuardia; he could not even say whether she was located anywhere close to Mr. LaGuardia. (Dep. of Paul Puccini at 62, attached at Ex. C to Aff. of Louis J. Martino and at Ex. K to Aff. of Scott A. Korenbaum). Thus, Officer Puccini COULD NOT have given Sergeant Hackett information that would give rise to probable cause in the mind of the man who ordered Mrs. Flores arrested, and it is undisputed that Officer Puccini DID NOT give any such information to Sergeant Hackett. (Puccini Dep. at 62, 74–75, 78–79.) That being so, Defendants cannot rely on LaGuardia's picking up the packet from the bar to establish probable cause.

### B. *Strip/Body Cavity Search*

▬▬▬ Having no probable cause to arrest Mrs. Flores, Defendants had no right to subject her to a strip/body cavity search. In this Circuit, "the Fourth Amendment precludes ... officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or circumstances of the arrest." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986); *see also Wachtler v. County of Herkimer*, 35 F.3d 77, 81 (2d Cir.1994). Moreover, the limitation on an officer's right to conduct a strip/body cavity search of a person in police custody presumes that the person is in police custody with probable cause or at least some degree of particularized suspicion. *See Rivera v. United States*, 928 F.2d 592, 606–07 (2d Cir.1991). In this case, Mrs. Flores WAS NOT EVEN CHARGED WITH ANY CRIME. She was arrested on suspicion of harboring contraband when there was not the slight-

est basis to assume that she was doing so. There were absolutely no "exigent circumstances" justifying the intrusion on her person. The arrest was patently unlawful. Indeed, the only fair inference one can draw from this record is that she was arrested FOR THE PURPOSE OF BEING SEARCHED, in the hope that the police might find some evidence to link her to Frieary's unlawful activity. *See, e.g.,* Statement of Det. Sgt. Mark Hackett, attached as Ex. G to Martino Aff. That turns the Constitution on its head and violates Mrs. Flores's right to be free from unwarranted searches.

## C. *Plaintiff's Claims*

In sum, on this record, Mrs. Flores is entitled to summary judgment on her claim that she was arrested without probable cause and searched in violation of her Fourth Amendment rights, unless qualified immunity protects some or all of the Defendants from liability. It does not. Therefore, Defendants' cross motion for summary judgment is denied.

### 1. *Det. Sgt. Hackett*

■ Turning to the motion to dismiss on the ground of qualified immunity, I first note that Defendants' papers, and particularly its memorandum of law, are patently deficient. Clearly, Det. Sgt. Hackett cannot claim qualified immunity, as he was responsible for the violation of Plaintiff's constitutional rights and he caused that violation without having probable cause; or even reasonable suspicion, to take the actions he did. As Plaintiff points out, the law with respect to probable cause was quite well settled, so the Sergeant could not have been under any illusion that what he was doing was justifiable. *See, e.g. Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir. 1994); *see also United States v. Jaramillo,* 25 F.3d 1146, 1153 (2d Cir.1994). Det. Sgt. Hackett is not entitled to qualified immunity, and therefore, summary judgment can be entered in Plaintiff's favor against Det. Sgt. Hackett on her claims for false arrest (First and Tenth Claims) and unlawful search and seizure (Third Claim).

### 2. *Officers Besley and Sierra*

■ The question is not so clear with respect to Officer Besley, who effected the arrest, and even less clear with regard to Officer Sierra, who conducted the search. On this record, there appears to be a question of fact as to whether Officer Besley knew that Det. Sgt. Hackett had no probable cause to arrest Mrs. Flores. Defendants have not established Officer Besley's entitlement to summary judgment; in fact, Defendants have not even submitted the papers required by Local Civil Rule 56.1(a) so as to permit this Court to search the record and reach a conclusion one way or the other. However, Plaintiff has not established that summary judgment should be entered in her favor against Officer Besley either. Therefore, the issue must abide a trial. As to Officer Sierra, it is entirely possible that she DID NOT have any reason to know that Plaintiff's arrest was unlawful, which would entitle her to qualified immunity. However, the record is simply too sparse to allow me to draw that conclusion. As a result, she must go to trial as well.

Accordingly, Plaintiff's motion for summary judgment is denied on her First, Third, and Tenth Claims solely with respect to Officer Besley, and on her Eleventh Claim solely with respect to Officer Sierra. Her motion is completely denied on her Second, Twelfth, Thirteenth, and Fourteenth Claims, in that they all rely upon the disputed question of Officer Sierra's knowledge.

### .3. *John Doe Defendants*

Plaintiff's Fourth and Fifth ˑ Claims, brought against unspecified John Doe defendants, are dismissed, as is Claim Eight, which Plaintiff brought against the City of Mount Vernon and premised upon the conduct of an unspecified John Doe defendant.

### 4. *City of Mount Vernon*

█ Plaintiff brought eight other claims against the City of Mount Vernon, asserting violations of her federal and state constitutional rights and of state law (Sixth through Fourteenth Claims.) For her Sixth, Seventh, and Ninth Claims, Plaintiff alleged that Mount Vernon municipal employees acted in accordance with established municipal policy in conducting the unlawful strip search which violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiff's Sixth and Seventh Claims do not articulate the municipal policy under which the individual defendants acted; accordingly, these two claims are dismissed with leave to replead.[1] However, Plaintiff's motion for summary judgment on the more artfully pleaded Ninth Claim is granted.

█ As the Supreme Court held in *Monell v. Department of Social Services,* an individual plaintiff may sue a municipality directly under § 1983 only for constitutional deprivations inflicted pursuant to a governmental custom or policy. *Monell,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may not be held liable under § 1983 for the actions of its employees under a theory of *respondeat superior. See Batista v. Rodriguez,* 702 F.2d 393, 396 (2d Cir.1983) (citing *Monell,* 436 U.S. at 691, 694, 98 S.Ct. 2018). "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista,* 702 F.2d at 397. This does not mean that the plaintiff

must show that the municipality had an explicitly stated rule or regulation that gave rise to the violation. *See Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). The plaintiff may establish "the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a 'custom or usage' and proof that this practice was so manifest and widespread as to imply the constructive acquiescence of the policy-making officials." *White–Ruiz v. City of New York,* No. 93 Civ. 7233(DLC)(MHD), 1996 WL 603983 at *7 (S.D.N.Y. Oct. 22, 1996) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 871 (2d Cir.1992)).

No *Monell* motion has been made by the municipal defendants here, and none would lie, since the search was conducted pursuant to an admitted policy of strip searching everyone who was arrested for narcotics activity. *See* Hackett Dep. at 61; Dep. of Det. Courtney Besley at 53–54, attached at Ex. G to Korenbaum Aff.; Dep. of Christopher Laird at 50–51, attached at Ex. J to Korenbaum Aff.; Cosenza Dep. at 59–61; and Dep. of Nyrita Sierra at 21–22, attached at Ex. H to Korenbaum Aff. As discussed above, the unlawful search by Mount Vernon's municipal employees violated Mrs. Flores's Fourth and Fourteenth Amendment rights. Accordingly, she is entitled to summary judgment against the City of Mount Vernon on her Ninth Claim.

In her remaining two claims, Plaintiff seeks relief from the City of Mount Vernon for violations of Article I, Section 12 of the New York State Constitution, which provides "[s]ecurity against unreasonable

---

1. Plaintiff's Sixth Claim alleges that defendants Hackett, Besley, and Doe 9 acted pursuant to a Mount Vernon Police Department policy "authoriz[ing] strip searches of persons taken into police custody as a result of an arrest." The Seventh Claim alleges merely that Mrs. Flores was unlawfully searched "pursuant to established policy of the Municipal Defendants" without specifying the policy.

The record before this Court demonstrates that the relevant Mount Vernon policy more closely resembled the allegations of the Ninth Claim: "to subject to strip and/or body cavity searches all persons arrested for *narcotics-related* offenses." Amended Compl. ¶ 90 (emphasis added). I note that, when all is said and done, these two claims may well be duplicative of the Ninth Claim.

searches, seizures, and interceptions." N.Y. .Const. Art I, § 12 (McKinney's 1998). Judge Lowe of this Court recently observed that "[n]o explicit constitutional or statutory authority sanctions a private right of action for violations of the New York State Constitution." *Wahad v. F.B.I.*, 994 F.Supp. 237, 238 (S.D.N.Y.1998) (citing *Brown v. State*, 89 N.Y.2d 172, 186, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996)). In *Brown v. State*, the New York Court of Appeals recognized a private right of action against the State of New York for violations of the equal protection and search and seizure clauses of the New York State Constitution, analogizing to the United States Supreme Court's analysis in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Brown*, 89 N.Y.2d at 187–89, 652 N.Y.S.2d 223, 674 N.E.2d 1129.

However, the *Brown* Court of Appeals found the "narrow remedy" necessary in that case only because plaintiffs had no other basis for relief against the State for state constitutional violations. *See Brown*, 89 N.Y.2d at 192, 652 N.Y.S.2d 223, 674 N.E.2d 1129. By contrast, in this case, as in *Wahad*, "[t]he rationale of *Brown* is inapplicable.... [T]he existence of alternative damage remedies under Section 1983 obviates the need to imply a private right of action" under the state search and seizure clause. *Wahad*, 994 F.Supp. at 240.

Accordingly, Plaintiff's Tenth and Eleventh Claims are dismissed with respect to the municipal defendants because no private right of action exists for violations of the New York State Constitution where a Plaintiff has alternative damage remedies available, as Mrs. Flores does under her § 1983 claim.

The discovery deadline is extended to February 26, 1999. The parties are directed to be trial-ready under my rules on March 30, 1999. Responses to *in limine* motions, if any are made, are due April 12, 1999. The Court will conference the case shortly thereafter to resolve any outstanding pre-trial issues, including whether the damages phase of the case should be bifurcated from the liability trial against Officers Besley and Sierra.

This constitutes the decision and order of the Court.