Patricia BOLDEN, James Bolden, Cierra Kerr, and Yannell Miller, Plaintiffs,

v.

VILLAGE OF MONTICELLO, Jerry Deitz, individually, Thomas O'Connor, individually, and John Does I through V, individually, Defendants.

Latoya Farrar, Vincent Bolden and Omar Thomas, Plaintiffs,

v.

Village of Monticello, Jerry Deitz, Thomas O'Connor, John Does 1 through 5 and Jane Does 1 through 5, Defendants.

Nso. 04 CIV.1372(CM)(MDF), 04 CIV.4026(CM)(MDF).

United States District Court, S.D. New York.

Nov. 4, 2004.

Ambrose W. Wotorson, Law Offices of Ambrose Wotorson, P.C., Richard Jonathan Katz, New York City, for plaintiffs.

Brian Joseph Powers, Law Office of Patrick Collligan, Harrison, NY, for defendant Village of Monticello.

Michael Francis Grady, Rende Ryan & Downes, LLP, White Plains, NY, for defendants Jerry Deitz, Roland Theodoor Koke, Thomas O'Connor, Does I through V, County of Sullivan.

## DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATING CASES

McMAHON, District Judge.

Plaintiffs in both actions are suing defendants for alleged civil rights violations arising out of a search of 40 Cottage Street in Monticello, New York in the early morning hours of August 25, 2001. Plaintiffs claim police officers, including defendants Jerry Deitz and Thomas O'Connor, violated their rights under the First, Fourth and Fourteenth Amendments to the United States Constitution by obtaining a search warrant by fraud and executing it unreasonably, subjecting plaintiffs to "strip" and "body cavity" searches and the use of unnecessary physical force. Plaintiffs claim the unlawful search was the culmination of a longstanding rancorous relationship between the parties, undertaken solely to harass plaintiffs on account of their race.

Defendants Deitz and O'Connor have moved for summary judgment on the basis that they are qualifiedly immune from suit for actions taken in their official capacity as police officers, because they carried out the search in question pursuant to a search warrant issued by a magistrate.

For the reasons discussed below, I find that neither Deitz nor O'Connor is shielded by qualified immunity, as a matter of law.

### Qualified Immunity

Qualified immunity shields a public official from civil liability when his conduct "does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993); *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir.2003). A police officer is qualifiedly immune from suit if (1) his conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for the officer to believe his conduct did not violate clearly established constitutional rights. *Lennon v. Miller*, 66 F.3d 416, 418 (2d Cir.1995); *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d. Cir.1994).

The issue of qualified immunity is a matter of law to be determined at the earliest point in a case, so that an officer who is entitled to the doctrine's protections can take full advantage of them. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Once accused, an individual defendant has the burden of proving that it was "'objectively reasonable' for him to believe that his behavior did not violate plaintiffs' clearly established constitutional rights." *Lennon*, 66 F.3d at 418 (2d Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Objective reasonableness is established where "officers of reasonable competence could disagree" as to the legality of the defendant's actions. *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). An officer's actions will be found objectively unreasonable, and summary judgment will be denied, if "no

officer of reasonable competence could have made the same choice in similar circumstances." *Lennon,* 66 F.3d at 420–21. The Court must ascertain the "objective reasonableness" of the officers' actions "assessed in light of legal rules that were 'clearly established' at the time the action was taken." *Id.* at 639, 107 S.Ct. 3034 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

■ For purposes of deciding the issue of qualified immunity, the defendants' version of the facts is absolutely irrelevant. The only relevant inquiry is whether the constitutional right that plaintiffs claim was violated rests on law that is well-settled: if it does, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19, 102 S.Ct. 2727. Claims that a public official made a reasonable mistake of fact, as opposed to a mistake of law, "go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was entitled to qualified immunity." *Stephenson,* 332 F.3d at 78 (citing *Saucier,* 533 U.S. at 205–06, 121 S.Ct. 2151).[1]

For purposes of this discussion, the following definitions apply: "strip search" refers to the inspection of the naked body of the person searched; "visual body cavity search" refers to a strip search including a visual examination of the anal and genital areas of the person searched; and "invasive body cavity search" refers to a strip search including digital probing of the anal and genital areas of the person searched

by the person performing the search. *See, e.g., Security and Law Enforcement Employees, District Council 82, et al. v. Carey,* 737 F.2d 187 (2d Cir.1984). The term "body searches" is used to distinguish the strip and cavity searches of plaintiffs' persons from the search of the inanimate objects within the apartment at 40 Cottage Street.

### The Allegations

On August 23, 2001, Justice Robert Kesten of the Village of Monticello issued a warrant authorizing a no-knock search of 40 Cottage Street "and all persons located inside the apartment at the time of the search." (Search Warrant, Exh. A to Defendants' Notice of Motion to Dismiss Complaint, dated July 30, 2004). There is nothing in the warrant specifically identifying any individual or authorizing any strip search or visual or invasive body cavity search of any person.

At the time of the issuance and execution of the warrant, plaintiff Patricia Bolden resided at 40 Cottage Street with her daughter, plaintiff Yannell Miller, her nieces, plaintiffs Latoya Farrar and Cieara Kerr,[2] and plaintiff James Bolden. (Plaintiffs' 56.1 Statement, case number 04 Civ. 1372, at ¶ 2 ("Bolden 56.1"); Plaintiffs' Mem. in Opp., case number 04 Civ. 1372, at 4 ("Bolden Mem."); Exhs. 1–6 to Complaint, case number 04 Civ. 1372, filed February 18, 2004 ("Bolden Comp.")). Plaintiffs Vincent Bolden and Omar Thomas "would come up to stay with [Ms. Bolden at 40 Cottage Street] in the summers," (Bolden 56.1 at ¶ 2), and were apparently present at 40 Cottage Street during the

---

**1.** Since defendants' version of events is irrelevant for purposes of deciding qualified immunity, all references to defendants' 56.1 statement in the following discussion of the events underlying plaintiffs' claims are for the establishment of undisputed facts that were admit-

ted in plaintiffs' 56.1 statement but were not otherwise elaborated on by plaintiffs.

**2.** The caption in this action shows the name "Cierra Kerr," however in her signed statement attached to the Bolden Complaint (Exh. 3), Ms. Kerr spells her name, "Cieara."

execution of the warrant. It is unclear whether Vincent Bolden or Omar Thomas lived at 40 Cottage Street at that time. (Plaintiffs' 56.1 Statement, case number 04 Civ. 0426, at ¶ 2 ("Farrar 56.1")).

*History*

Plaintiffs allege a history of racially motivated harassment at the hands of Deitz and O'Connor prior to the search in question.

According to plaintiffs, Latoya Farrar testified at her deposition that O'Connor and Deitz (1) were "constantly harassing the occupants of 40 Cottage Street" and were "constantly driving by" the premises, "six or seven" times a day; (2) repeatedly used "racial slurs directed at the occupants of 40 Cottage Street," including statements such as, "Niggers all sell drugs;" (3) would drive by 40 Cottage Street, "and shout statements and threats at the occupants that 'you're next' and 'we'll get you;' " and (4) followed Vincent Bolden and Omar Thomas, and followed and searched other African–Americans, "for no apparent reason." (Farrar 56.1 at ¶ 9).

In her signed statement attached to the Bolden Complaint, Cieara Kerr states that she observed O'Connor and Deitz sitting in a vehicle in front of 40 Cottage Street sometime prior to August 25, 2001, and that she heard them say, "All niggers sell drugs," and that, if they did not go back inside 40 Cottage Street, they would be "locked up." (Bolden 56.1 at ¶ 8). Ms. Kerr claims she also overheard arguments between Patricia Bolden and O'Connor and Deitz at various times prior to the search, that O'Connor and Deitz called Ms. Bolden a "black bitch," and a "fat bitch," and that Ms. Bolden called the officers "cracker." (*Id.*)

Plaintiffs allege that Vincent Bolden stated at his deposition that prior to August 25, 2001, O'Connor (1) falsely accused Vincent Bolden of trespassing and improp-

erly forced him to leave a housing complex he was visiting; (2) approached him on the street on another occasion and "threw him up against his patrol car, accused him of robbing a house and patted him down" without further questioning or arresting him; and (3) pulled him over in a car on another occasion, singled him out of the group of people in the car, again accused him of robbing a house and searched him without arresting him. (Farrar 56.1 at ¶ 10). Plaintiffs also contend that Vincent Bolden testified at his deposition that Deitz and O'Connor would follow him on the street and ask him what he was doing in the area, and would drive by 40 Cottage Street "very slowly and shine a big light on the premises." (*Id.*)

According to plaintiffs, Omar Thomas testified at his deposition that defendants (1) would "constantly harass him by asking: What are you doing here? Where are you[ ] from?" (2) stopped him "unjustifiably" on more than 10 occasions; (3) would "accost him on the street and empty his beverage without reason or provocation;" (4) used racial slurs directed at Vincent Bolden; and (5) used "derogatory homosexual remarks about a neighbor on Cottage Street." (Farrar 56.1 at ¶ 11).

*The Search*

On August 25, 2001, police officers, including defendants Deitz and O'Connor, both detectives with the Monticello Police Department, executed the warrant and searched the premises and the occupants of 40 Cottage Street. (Bolden Comp. at ¶ 6).

*Patricia Bolden.* Shortly before 6 am on August 25, 2001, Ms. Bolden heard a loud bang, as police officers kicked down the door and entered her apartment. (Exh. 2 to Bolden Comp., Statement of Patricia Bolden, dated October 9, 2001). Officers "kicked" and "stomped" on Ms.

Bolden, and then pulled her up off the floor and handcuffed her. (*Id.*) An unidentified police officer (not Deitz or O'Connor) held a gun to Ms. Bolden's head while she was handcuffed and told her he would shoot her if she moved or "even breath[ed]." (*Id.*) Ms. Bolden claims that Deitz and O'Connor were standing behind that unidentified officer while he held a gun to her head. (Bolden 56.1 at ¶ 3). A female officer performed an invasive body cavity search of Ms. Bolden, which yielded no contraband; Ms. Bolden claims she was then subjected to a second invasive body cavity search, in response to a directive from O'Connor and a comment from him that Ms. Bolden is a "big fat black bitch." (*Id.* at ¶ 5). After the second cavity search, Ms. Bolden alleges that she was "dragged" from her bedroom to the front hallway, partially dressed, by three officers (not Deitz or O'Connor). (*Id.* at ¶ 5).

Ms. Bolden's signed statement attached to the Bolden Complaint also alleges (1) that female officers performed the two invasive body cavity searches in her bedroom in front of male officers; (2) that she asked to use a toilet to relieve herself and clean up blood that had gotten on her legs during the cavity searches, but that she was denied access to a toilet and was forced to urinate on the floor in front of the officers; and (3) that she was forced to sit in the hallway outside her apartment in her soiled underwear for hours. (Exh. 2 to Bolden Compl., Statement of Patricia Bolden, dated October 9, 2001).

In her deposition, Ms. Bolden stated that she saw Deitz and O'Connor, "Tearing up the place" during the search. (Examination Before Trail of P. Bolden, July 6, 2004 at 74:21). Specifically, she said of police officers'—including Deitz's and O'Connor's—actions during the search,

> In the living room they ripped all the cushions apart, they took the pictures down from the wall, knocked them down from the wall, pulled the stereo, knocked the stereo on the floor, ripped the couches and chairs apart in the living room. One of them kicked a hole in the TV in the living room, they took the carpet up, ripped the carpet off the floor. In the kitchen they broke every ˎglass, dish, that I had. They took everything out of the refrigerator. They was eating food and spitting it back in it. They opened rice and poured that on the floor, eggs, mash potatoes, they took clothes... they poured Clorox and Ajax all over the clothes. They ripped apart everything. I didn't have anything left after they finished. They broke every glass, dish, picture, they even ripped pictures of me and my daughter and everything." (*Id.* at 75:4–22).

Ms. Bolden was provided with a copy of the warrant at the completion of the search. (Def. 56.1 at ¶ 4).

*Yannell Miller.* According to Ms. Miller, O'Connor "slammed her...to the ground, handcuffed her and held a gun to the back of her head." (Bolden 56.1 at ¶ 7.) Plaintiffs also claim that Cieara Kerr recalled that O'Connor had his gun trained on Ms. Miller during the execution of the warrant. (Bolden 56.1 at ¶ 7). A female officer apparently escorted Ms. Miller to the bathroom where she was searched by that officer. (Def. 56.1 at ¶ 7).

*Cieara Kerr.* Cieara Kerr was "handcuffed and searched by female officers" during the search. (Def. 56.1 at ¶ 8).

*LaToya Farrar.* Plaintiffs allege that Ms. Farrar was led to the bathroom for a strip search, partially dressed, in front of male officers. (Farrar 56.1 at ¶ 9). According to plaintiffs, Ms. Farrar testified in her deposition that, during the search, (1) Ms. Farrar's shirt was pulled up by the female officers and she was searched underneath her bra and underwear; (2) Ms.

Farrar's "breasts and vagina were exposed;" (3) Ms. Farrar's "anus was digitally probed;" (4) Ms. Farrar's "vagina was attempted to be digitally probed, although she screamed so loud that the officer retreated;" (5) Ms. Farrar was "kicked and stepped on by defendants;" (6) Ms. Farrar's jewelry was taken or destroyed during the raid and not recovered; and (7) Ms. Farrar observed bleach being poured on Ms. Bolden's clothing. (*Id.*)

O'Connor allegedly pointed a gun at Ms. Farrar during the search. (Def. 56.1 at ¶ 9).

*Vincent Bolden.* According to plaintiffs, Vincent Bolden stated in his deposition that (1) a gun was put to his back; (2) he was handcuffed, "picked up off the couch and dropped onto the floor;" (3) Deitz "choked" him; (4) he heard Deitz punch James Bolden in the side and heard James Bolden scream in pain; (5) he observed O'Connor "ravaging and breaking up the apartment;" (6) O'Connor made racist comments during the search, such as, "Niggers in there selling drugs," calling Patricia Bolden "fat," and "making black people jokes;" (7) he observed "defendants" breaking glasses and dishes, and a computer, couches, clothing, luggage and video games were destroyed during the search. (Farrar 56.1 at ¶ 10). Plaintiffs argue that Vincent Bolden further stated in his deposition that he was strip searched, told to "bend over, spread his buttocks and cough," and was made to "lift up his scrotum." (Farrar 56.1 at ¶ 10).

*Omar Thomas.* According to plaintiffs, Mr. Thomas testified at his deposition that, during the search on August 25, 2001, (1) Deitz threw him on the floor, put a knee into his back, and pointed a gun at his head; (2) defendants made racial jokes and jokes about the premises; (3) O'Connor strip searched Mr. Thomas, and forced him to "bend over, cough, spread his buttocks and lift his scrotum;" and (4) that clothing and luggage was destroyed during the search. (Farrar 56.1 at ¶ 11).

*James Bolden.* "[A] sheriff's department officer, not Deitz or O'Connor, pointed a weapon at [James Bolden's] head and told him to get down on the floor," where he was told to remain. (Def. 56.1 at ¶ 12). He was advised that a search warrant for drugs was being executed, and was later shown a copy of the warrant. (*Id.*) He apparently recalled, "Some racial slurs during the first 15 minutes," but could not attribute them to a specific individual. (*Id.*) James Bolden testified at his deposition that officers broke "various items" during the search, but he did not attribute those actions specifically to Deitz or O'Connor. (*Id.*) He was taken to the bathroom and asked to undress; O'Connor was present during the search. (*Id.*) Plaintiffs assert that James Bolden was asked to, "Pull his buttocks cheeks apart, so as to reveal his anus," (Bolden 56.1 at ¶ 12), and that O'Connor said, "You can open wider than that." (*Id.*) James Bolden apparently was not touched during the search. (*Id.*)

*The Warrant*

■ In cases where a search warrant is required, the warrant must be issued by a neutral magistrate based on a finding of probable cause to believe the items sought will be found at the identified location. *See, e.g., Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).[3] The issuance of a warrant by a neutral magistrate creates a presumption

---

**3.** I decline to address Plaintiffs' malicious prosecution claim at this stage, as it is based on essentially the same allegations as those underlying the warrant challenge and does not impact my decision on this motion for summary judgment on qualified immunity.

that it was "objectively reasonable for the officers to believe there was probable cause" to support the application. *Golino v. City of New Haven*, 950 F.2d 864, 870–71 (2d Cir.1991).

A plaintiff claiming a warrant was issued without probable cause faces an extraordinary burden, requiring a "substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement" that was "necessary to the finding of probable cause." *Id.* (internal quotations and citations omitted). Qualified immunity is not available, however, to an officer who knew that he materially misled a magistrate about the basis for a finding of probable cause. *Id.* at 871.

Plaintiffs allege that defendants obtained the search warrant in question "by wholly fraudulent means." (Second Amended Complaint, 04 Civ. 1372, dated August 9, 2004 (the "Amended Complaint") at ¶ 6(k)). Plaintiffs claim defendants have not produced "any evidence relating to any 'drug sales' taking place[ ] at 40 Cottage Street. In fact, the search warrant does not give any indication whatsoever... as to the probable cause for a search warrant." (Bolden 56.1 at ¶ 1). Plaintiffs assert that no contraband was discovered during the search, no arrests were made, and no criminal action, indictment, complaint or proceeding was brought against any of the plaintiffs relating to the sale of narcotics. (Am. Comp. at ¶ 6(1)). The Amended Complaint contends that plaintiffs believe the defendants obtained and executed the warrant purely to "teach [plaintiffs] a lesson," and not for any legitimate law enforcement purpose. (*Id.* at ¶ 6(j)).

Since no discovery has been conducted on this issue to date, I can reach no conclusion about the validity of the warrant at this time. However, I need not reach that issue here: as discussed below, even assuming *arguendo* that the warrant was validly issued on the basis of probable cause, it is still clear that Deitz and O'Connor are not entitled to qualified immunity as a matter of law if plaintiffs' allegations are true.

### Discussion

#### Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact," and the undisputed facts warrant judgment for the moving party as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (*"Anderson II"*). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will prop-

erly preclude summary judgment." *Anderson II*, 477 U.S. at 248, 106 S.Ct. 2505.

As noted above, a police officer is entitled to qualified immunity if (1) his conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for the officer to believe his conduct did not violate clearly established constitutional rights. *Lennon*, 66 F.3d at 418. For the reasons discussed below, I find that neither Deitz nor O'Connor is shielded by qualified immunity, and therefore the motion for summary judgment is denied.

*Summary of Plaintiffs' Allegations of Constitutional Deprivations*

To put the necessary analysis into context, it is helpful to summarize the claims that each plaintiff makes against defendants O'Connor and Deitz:[1]

*Patricia Bolden* alleges that O'Connor directed that she be strip searched, including digital probing of her body cavities, in her bedroom, in front of male officers (although she was touched only by females) and without probable cause. And she alleges that Deitz and O'Connor carried out their search of her home in an unreasonable manner. She also alleges that she was subjected to excessive force, in that she was kicked and stomped and threatened with a gun without provocation, and that Deitz and O'Connor were present when that occurred and did nothing to prevent it.

*Yannell Miller* alleges that O'Connor used excessive force against her.

*LaToya Farrar* alleges that she was strip searched, including digital probing, in front of male officers, and without probable cause, and also that she was subjected to excessive force in that she was kicked and stepped on. O'Connor was allegedly present during the search, pointing a gun, and did nothing to stop any of these alleged constitutional violations.

*Vincent Bolden* alleges that he was subjected to excessive force by Deitz, who choked him, and that he was strip searched without probable cause.

*Omar Thomas* alleges that Deitz employed excessive force against him and that O'Connor strip searched him without probable cause.

*James Bolden* alleges that he was strip searched without probable cause, in O'Connor's presence, and that O'Connor participated in that search.

*1. Plaintiffs' Rights Were Clearly Established*

▮ The rights to be free from unreasonable searches and the application of excessive force have long been clearly established. *See* U.S. CONST. amend. IV (unreasonable search); *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (unreasonable search); *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir.2002) (excessive force). No search warrant shields a police officer from carrying out a search in an unreasonable manner or from employing excessive force during a search. It would be frivolous for defendants to argue otherwise.

Of particular interest for this case, for more than two decades, courts have specifically and repeatedly recognized the importance of guarding against unreasonable strip searches, in view of the degrading nature of this particular invasion of privacy. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the

---

**1.** It does not appear that Cieara Kerr alleges anything specific against either Deitz or O'Connor.

United States Supreme Court ruled that Fourth Amendment reasonableness analysis had to balance the need for a particular search against the invasion of personal rights implicated. Stating that the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Chief Justice Rehnquist held that the reasonableness of a strip search turned on (1) the scope of the intrusion, (2) the manner in which the search is conducted, (3) the justification for initiating the search, and (4) the place in which the search is conducted. *Bell,* 441 U.S. at 559, 99 S.Ct. 1861. And while the Supreme Court stated in 1973 that "full body searches" incident to a lawful arrest, for example, were reasonable under the Fourth Amendment, *U.S. v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), numerous post-*Bell* courts have held that strip searches are not automatically justified by a lawful arrest. *See Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991).

■ A lawful arrest, like a valid search warrant, creates a presumption of reasonableness regarding an attendant search. As indicated by the decisions above, however, this presumption can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner. A strip search—even without any type of body cavity examination—has always been viewed as an extraordinary invasion of privacy requiring consideration of the "totality of circumstances" and analysis under the *Bell* factors for reasonableness. *See, e.g., Sarnicola v. County of Westchester,* 229 F.Supp.2d 259, 269–74 (S.D.N.Y.2002). Thus, it is clear that the existence of a warrant authorizing the search of a person or persons, without more, does not justify the extraordinary invasion of privacy caused by a strip search, let alone a visual or invasive body cavity search.

■ The United States Court of Appeals for the Second Circuit has exhibited considerable regard for the right of any person—even a person who has been lawfully arrested and confined in a correctional facility pending trial—not to be subjected to a strip search unless there exists particularized suspicion that an individual is secreting contraband. *See, e.g., N.G. v. Connecticut,* 382 F.3d 225, 239 (2d Cir. 2004) (discussing the "special needs" of government in maintaining security in detention facilities and similar settings and the requirement of individualized suspicion for all strip searches); *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986) (finding strip and cavity search of arrestee, without reasonable suspicion to believe she was secreting contraband or weapons, unconstitutional); *Wachtler v. County of Herkimer,* 35 F.3d 77 (2d Cir.1994) (finding policy of strip searching misdemeanor arrestees without reasonable suspicion to suspect hidden contraband or weapons defeated qualified immunity); *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988) (finding strip search of person arrested for unpaid parking tickets defeated qualified immunity); *see also Flores v. City of Mount Vernon,* 41 F.Supp.2d 439 (S.D.N.Y.1999) (requiring individualized suspicion of secreted contraband or weapons for strip search, even during execution of search warrant); *Sarnicola,* 229 F.Supp.2d 259 (finding strip search in the absence of particularized reasonable belief that suspect was secreting drugs defeated qualified immunity). The same standard of particularized reasonable suspicion applies to persons like corrections officers, who work in secure facilities. *Carey, supra,* 737 F.2d at 207. Even searches where the person being searched is not "stripped" can run afoul of the reasonableness requirement. *McKelvie v. Cooper,* 190 F.3d 58, 62 (2d Cir.1999) (finding aggressive over-the-clothing search in-

cident to warrant that did not authorize search of any person raised question of reasonableness under the Fourth Amendment). And there are instances when the line between a reasonable and unreasonable search carried out pursuant to a warrant has been drawn at the strip search. *See, e.g., DeFelice v. Ingrassia,* 66 Fed. Appx. 240 (2d Cir.2003) (unreported) (finding under-the-clothing search of plaintiff not unreasonable under the Fourth Amendment where warrant authorized a search of the person and officer did *not* conduct a "strip," "body cavity" or "visual body cavity" search, and the execution of the search was otherwise reasonable.)

In *Flores v. City of Mount Vernon,* 41 F.Supp.2d 439 (S.D.N.Y.1999), this Court held that a search warrant naming the place to be searched and the individual who owned the building did not constitutionalize the arrest and strip search of an employee who was not named in the warrant. The employee was present when the search warrant was executed in that case, but there was no independent indication that she was secreting narcotics and no probable cause to believe that anybody who did possess narcotics got them from her. Officers handcuffed her and took her to the police station for the purpose being searched, without the "slightest basis" to believe she was hiding narcotics. *Id.* at 444–45.

Similarly, in *Campbell v. Police Officer David Fernandez,* 54 F.Supp.2d 195, 197 (S.D.N.Y.1999), this Court observed that a strip search, in and of itself, would not necessarily violate plaintiff's rights. *Id.* at 198. But in the absence of evidence that plaintiff represented any threat to the officers, or that he had the ability to dispose of contraband, I ruled that the officers conducting the search might have acted unreasonably. *Id.* I further held that plaintiff's allegation that he was searched in a public place, where people could view his humiliation, raised a question of reasonableness. Significantly, in *Campbell,* the warrant described the physical characteristics of the person to be searched, and the description matched the plaintiff, unlike the present case, where the warrant contained no description of any person.

And recently, in *Sarnicola,* this Court held that a strip search defeated qualified immunity where the officer had probable cause to arrest the plaintiff but had no reason to believe she was secreting contraband. 229 F.Supp.2d at 268. In that case, narcotics agents had arranged a "buy and bust" of a known drug dealer who had previously sold large amounts of narcotics to an undercover agent. The plaintiff, Nicole Sarnicola, was the driver of a vehicle that followed the drug dealer's vehicle to the arranged meeting place. *Id.* at 262–64. Officers observed Sarnicola getting out of her car, participating in a conversation with two men (one of whom was later determined to be the drug dealer's supplier), and leaving the parking lot shortly before the "buy and bust" was completed. *Id.* The officer in charge of the "buy and bust" believed, based on his experience, that Sarnicola was a participant in drug activity, and had her arrested and sent to the police station for a strip search—even though he admitted he had not the slightest reason to suspect that she was secreting drugs on her person. *Id.* at 275. At the station, Sarnicola was strip searched by a female officer, who also performed a visual body cavity search. *Id.* at 264. In denying summary judgment on the issue of qualified immunity for the officer who ordered the strip search, I held that while any reasonable officer would have believed there was probable cause to arrest Sarnicola, *no* reasonable officer could have believed a strip search was justified in the complete absence of individualized suspi-

cion that Sarnicola was secreting drugs. *Id.* at 268.

Thus, the issuance of a warrant authorizing a search of the premises and persons located therein does not automatically authorize the officers executing the warrant to perform strip or cavity searches (either visual or invasive) on the persons located on the premises.

Nor does it authorize the use of force in excess of what is reasonably necessary to secure the premises. It has long been established that police officers are entitled to use "objectively reasonable" force to secure premises during the execution of a warrant, to be analyzed from the perspective of a reasonable officer on the scene. *Graham v. M.S. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Terry v. Ohio*, 392 U.S. 1, 22–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Saucier*, 533 U.S. at 206–07, 121 S.Ct. 2151. The Supreme Court has set forth a list of factors to be considered in evaluating a claim of excessive force under the Fourth Amendment, including: "the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Saucier*, 533 U.S. at 204, 121 S.Ct. 2151 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).

In analyzing a claim of excessive force, allowance must be made for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* Finally, a warrant to

search a home for drugs "implicitly carries with it authority to detain the occupants at the premises while the search is conducted." *Speights v. City of New York*, Nos. 98 CV 4635(NG)(JMA), 98 CV 4636(NG)(JMA), 2001 WL 797982, *5 (E.D.N.Y. June 18, 2001).

In executing a search warrant for drugs, as in this case, it is reasonable for police officers to enter a residence with guns drawn to secure the area and prevent harm to themselves or others. *See, e.g., Speights*, 2001 WL 797982; *Anderson v. United States*, 107 F.Supp.2d 191 (E.D.N.Y.2000) ("*Anderson III*"). The use of force beyond what is reasonably necessary to prevent violence or the destruction of evidence, however, violates the Fourth Amendment prohibition against unreasonable searches. *Compare, e.g., McKelvie*, 190 F.3d at 60–63 (forcing suspects to lie prone on a floor for duration of search of premises after officers' initial safety concerns had been satisfied by frisks raised question of reasonableness) *and Anderson III*, 107 F.Supp.2d at 198–99 (forcing suspect's head into a garbage can while he was handcuffed raised question of reasonableness) *with Wright v. Santopietro*, 325 F.Supp.2d 79 (D.Conn.2003) (no excessive force where officers handcuffed individuals and made them lie down in the street while officers searched a vehicle for drugs, but where there was no evidence that officers "hit, punched or kicked" plaintiffs).

Thus, the law is clear that police officers may use an amount of force reasonably necessary to secure the premises and prevent harm to themselves or others—and no more—while executing a search warrant for drugs. Plaintiffs' rights, therefore, were clearly established at the time of the search.

*2. No Reasonable Officer Could Believe Deitz and O'Connor Did Not Violate Plaintiffs' Rights if Plaintiffs' Allegations Are True*

Having determined that plaintiffs' rights were clearly established, I now turn to the question of whether any reasonable officer could have believed that Deitz and O'Connor did not violate plaintiffs' rights—either by their actions or by their failure to intercede—by conducting, authorizing or witnessing the various strip searches, or by using excessive force while restraining plaintiffs during the conduct of the search. Focusing on plaintiffs' allegations, as I must, I find in the negative: no reasonable officer would have done what Deitz and O'Connor are alleged to have done without knowing he was violating plaintiffs' rights.

Plaintiffs claim that Deitz and O'Connor, among other acts, did—or did nothing to stop—the following: (1) caused Patricia Bolden to undergo two invasive body cavity searches, in front of male officers, because she is "a fat black bitch;" (2) denied Patricia Bolden access to a toilet and effectively forced her to urinate on the floor in handcuffs, partially dressed, in front of male officers; (3) performed an invasive body cavity search of Latoya Farrar; (4) performed visual body cavity searches of Vincent Bolden, Omar Thomas and James Bolden; (5) "kicked" Latoya Farrar; (6) "choked" Vincent Bolden; (7) "punched" James Bolden; (8) spit in food; (9) poured bleach on clothes; (10) ripped up personal pictures; (11) broke every dish in the house and generally destroyed the apartment and violated its occupants during the search.

Viewing these allegations through the lens of a reasonable police officer—and assuming, as I must, that the allegations are true—the search was clearly unreasonable.

Focusing first on the body searches as the most egregious activity, these were not merely strip searches. Defendants are alleged to have conducted invasive body cavity searches of two women and visual body cavity searches of three men. Patricia Bolden claims she was searched *twice,* in her bedroom, in front of male officers. Further, as intended, the no-knock search apparently surprised plaintiffs, who were literally dragged from their beds and would have had no opportunity to hide anything. *See, e.g., Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001) (noting that arrestees do not ordinarily have notice that they are about to be arrested and an opportunity to hide something); *Sarnicola,* 229 F.Supp.2d at 273 (same). The officers executing the search would not reasonably have suspected that plaintiffs were secreting contraband in bodily orifices while they slept, or that they would have been able to hide such contraband during the search, when plaintiffs were either handcuffed or surrounded by police officers. Finally, as noted above, no reasonable police officer could believe that a warrant authorizing a search of 40 Cottage Street "and all persons located inside the apartment"—without naming any particular individual—provided blanket authority for strip and body cavity searches of all of the plaintiffs under these circumstances.

Similarly, plaintiffs in this case allege that, in addition to restraining them and strip searching them, defendants kicked, punched, choked, stepped on and threatened them with guns without any provocation. Plaintiffs specifically identify Deitz and O'Connor as either participating in or witnessing these actions.

As noted above, police officers can take reasonable steps to secure the premises, and can use reasonable force as necessary to do that, including taking action to overcome resistance from people being

searched, restrained or arrested. But here, the allegations are that substantial force was employed, including not just restraint, but blows to the body with hands and fists. If the use of such force were necessary, then there would be no constitutional violation. Drawing all inferences in favor of plaintiffs, however, it was not "necessary" in this case to use force of the nature alleged, because plaintiffs were restrained or otherwise not in any position to cause harm or hide evidence. Qualified immunity does not attach because plaintiffs have alleged with some particularity the use of more force than was reasonably necessary under the circumstances.

Of course, as the case develops, the evidence may demonstrate that O'Connor and/or Deitz (1) did not conduct, authorize or witness any illegal strip search of the plaintiffs; (2) had probable cause to strip search some or all of the plaintiffs; (3) did not engage in the various humiliations alleged by plaintiffs; (4) were reasonably required to use force against some or all of the plaintiffs in order to secure the premises during the search. However, if the evidence exonerates defendants, it will be because they did not commit any constitutional violation—not because they are entitled to qualified immunity.

*Duty to Intervene*

 It is well settled that a police officer who sees a fellow officer violating an individual's rights is required to intervene. A police officer is not entitled to qualified immunity if his failure to intervene "permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights" and "the failure to intercede [occurred] ... under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 129 (2d Cir.1997).

Plaintiffs' allegations fairly admit of the inference that, at least in some of the instances alleged, Deitz and O'Connor witnessed other officers (or each other) performing acts that would constitute constitutional violations, either because they constituted excessive force or because they were unreasonable strip searches. If those allegations prove true, defendants are not entitled to qualified immunity. If the allegations are not true, of course, there will be a verdict for the defendants on the merits.

### Conclusion

For the foregoing reasons, therefore, defendants' motion is denied.

In addition, because these cases raise identical issues of fact and law, they are *sua sponte* consolidated for all purposes, including trial.

This constitutes the decision and order of the Court.