**Linda Won TRAVIS, Plaintiff,**

**v.**

**The VILLAGE OF DOBBS FERRY, The Village of Dobbs Ferry Police Department, Chief of Police of The Village of Dobbs Ferry Police Department George Longworth, Police Officer Timothy J. Mahoney, Lt. Betsy Gelardi, Det. Marc Bailey, Police Officer John Chirico, Police Officer Seah Conlin, and Sgt. Michael Spedaliere, Defendants.**

**No. 02 CIV. 6155 CM LMS.**

United States District Court, S.D. New York.

Feb. 8, 2005.

Paul I. Marx, Marx & Aceste, LLP, White Plains, NY, for Plaintiff.

Lewis R. Silverman, Rutherford & Christie, LLP, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART VARIOUS MOTIONS FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Defendants—police officers of the Village of Dobbs Ferry and the Village itself—have moved for summary judgment dismissing the complaint. The complaint charges them with false arrest, false imprisonment, and illegally strip searching the plaintiff. Defendants admit that some of the facts in this matter are hotly contested, but assert that they are nonetheless entitled to summary judgment because their actions did not amount to an arrest, and so could not have been a false arrest. Plaintiff cross-moves for partial summary judgment on the issue of liability on her first three claims for relief. For purposes of the motion, she accepts as true the key element of defendants' version of their story—the allegation that they decided to stop plaintiff's car based on an informant's tip. (The "informant" denied giving any tip).

On the record before me (the key portions of which are in fact undisputed), the police arrested plaintiff without probable cause, and thereafter subjected her to a search in violation of her Fourth Amendment rights. Plaintiff is entitled to summary judgment against certain of the individual defendants—specifically, defendants Longworth, Gelardi and Bailey—on the issue of liability on all of her causes of action. A trial on the issue of defendant Mahoney's liability for false arrest, against various defendants on plaintiff's claim for intentional infliction of emotional distress, and on damages—including punitive dam-

ages against the remaining defendants, will be scheduled at the earliest opportunity.

The Village of Dobbs Ferry's motion for summary judgment on plaintiff's *Monell* claim (but not on her claim for intentional infliction of emotional distress) is granted.

**The Undisputed Facts**

The following facts are undisputed—with one key exception. Because I am going to consider plaintiff's motion first, I accept as true defendants' version of any disputed facts.

Plaintiff is a resident of the Village of Dobbs Ferry. As of January 18, 2002, as far as the Dobbs Ferry Police Department were aware, plaintiff had no criminal record.

Two months before the date in question, on November 17, 2001, an individual named Carol Campana told Detective Bailey of the Dobbs Ferry Police Department that plaintiff "has been traveling to 183rd Place in the Bronx in her 1992 Volvo, color maroon, where she purchases cocaine and then returns to her residence in Dobbs Ferry ... [she] is also known to frequent a location known as the Raku Bar which is located on Amsterdam Avenue, Manhattan, where she also purchases cocaine. [She] routinely makes these trips to buy cocaine on Fridays between 1100 and 1430 hours." (At her deposition the alleged informant denied giving this "tip" (P.Exh. N, Campana Dep. at 35–37, 45), although she later recanted this testimony. Plaintiff accepts that the tip was given for the purposes of this motion.) (Plaintiff's Exhibit N at 35–37, 45.)

For the next eight Fridays, the investigative team tried to act on the information Campana had provided them. They saw nothing that was consistent with the informant's story.

On the ninth Friday, at approximately noon on January 18, 2002, Lt. James Guarneri of the Dobbs Ferry Police Department observed plaintiff in her maroon Volvo at the local Getty Gas Station/Mini-Mart. Lt. Guarneri contacted defendant Longworth, the Chief of Police. Longworth directed Guarneri to follow Ms. Travis. He did so until she entered the Saw Mill River Parkway going south. Lt. Guarneri did not follow Ms. Travis onto the Saw Mill River Parkway. He was told that Chief Longworth would dispatch defendants Bailey and Chirico (who were not even in Dobbs Ferry, but several miles north at the Hawthorne State Police Barracks on other business) to try to catch up with her. Chief Longworth testified at his deposition that, while putting gas in a car is not in and of itself a crime, it is consistent with an intent to engage in drug activity. (Plaintiff's Exhibit F at 186.)

Detective Bailey and Police Officer Chirico were unable to catch up to plaintiff's car. So they went to 183rd Street and Loring Place, the area of the Bronx where the informant claimed Ms. Travis would buy drugs. The two officers drove around the neighborhood for a while but did not see plaintiff, her car, or any illegal drug activity. No member of the Dobbs Ferry Police force ever saw plaintiff in the vicinity of 183rd Street and Loring Place on the day of her arrest.

Figuring that, if she were in the City, she would have to drive north to get home, the officers positioned themselves along the Major Deegan Expressway ("Deegan") in the vicinity of Kingsbridge Road and/or Fordham Road. While stationed there, they saw a car meeting the description of plaintiff's car coming north on the Deegan. According to Detective Bailey, plaintiff's car was spotted approximately one-half mile away (one full exit on the Deegan) from the place where the informant said she would be buying drugs. The officers had not seen the car until that point, so

they had no idea where in New York City it was coming from.

The two officers followed the maroon Volvo up the Deegan to the Saw Mill River Parkway North, where they got off at the Yonkers Avenue exit. They continued to follow the car into an area of Yonkers near the intersection of Yonkers Avenue and Ashburton Avenue. At that point, they discontinued their surveillance, for fear of being spotted in what they described as an "isolated area."[1] Believing that plaintiff was carrying narcotics, they contacted Police headquarters in Dobbs Ferry so that officers could watch the three primary roads that lead into the Village.

Assuming arguendo that the maroon Volvo was plaintiff's, she obviously got back onto the Saw Mill Rivery Parkway, because shortly after she exited the Parkway at Lawrence Avenue she was stopped by defendant Mahoney. Mahoney had testified that he was instructed by radio to stop the car "if he had reason to" because the detectives had "lost" it while on surveillance. Mahoney first observed plaintiff's car accelerating after stopping at a stop sign. They were traveling in opposite directions and made eye contact. Mahoney claims that plaintiff turned her head in surprise at seeing him, so he turned his RMP around and "kicked it up to approximately 60 mph" to come up behind her. As he was turning around, he claims that he saw Travis go through a stop sign. He stopped her at approximately 1:20 PM on Beacon Hill Drive in Dobbs Ferry.[2]

Shortly after plaintiff was stopped, Police Office Sean Conlin arrived on the scene, as did Detective Bailey and Officer Chirico and Sergeant Michael Spedaliere. Det. Bailey approached plaintiff, who was seated in her car. He asked if she would voluntarily turn over the drugs that he "knew" she had purchased. Plaintiff denied having any drugs and asked what was going on. Hoping to trick plaintiff into making an incriminating admission, Det. Bailey told plaintiff that they had her on videotape buying drugs in the Bronx. Ms. Travis denied being in the Bronx and produced for Bailey's inspection a dated receipt from the Paramount Pawn shop, which is located on the West Side of Manhattan.

Bailey persisted in his questioning. He ordered plaintiff out of her car and asked for permission to search it. No drugs were found after what every officer who testified described as a "thorough" search.

Bailey called Chief Longworth, who dispatched Lt. Betsy Gelardi to the scene so she could conduct a pat down frisk of plaintiff. After asking plaintiff if she had any drugs and being told that she did not, Lt. Gelardi frisked her. The frisk revealed nothing. Neither did an on-scene search of Travis's pockets. No one noticed any tell-tale bulges.

Nonetheless, Lt. Gelardi told plaintiff that she was under arrest for possession of narcotics (P. Exh. G, Gelardi Dep. at 69, 77). She was handcuffed, placed in the rear of a police car and driven to Dobbs Ferry Police Headquarters. When she arrived her purse was searched. There were no drugs in the purse. Then plaintiff was told to follow Lt. Gelardi to a cell, where a searched of her person could be made. Accepting for purposes of this motion Lt.

1. The Court finds it interesting that the officers discontinued their surveillance when they did. On literally dozens of occasions, members of the Yonkers Police Department and the Westchester DEA Task Force, testifying in suppression hearings and Section 1983 cases in my courtroom, have sworn that the area of Yonkers near the intersection of Yonkers Avenue and Ashburton Avenue is a "drug-prone" neighborhood.

2. If I were the trier of fact, I would have a hard time with the story of the stop. I am not. I accept defendants' version as true.

Gelardi's version of events, plaintiff was compelled to raise her shirt over her head, unclasp her bra to exhibit her breasts, and lower her pants to mid-thigh to allow inspection of her panties. The search was conducted in a cell monitored by a video camera that can be turned on and off by officers at the front desk, although there is no evidence that the camera was turned on while plaintiff was being searched.

No drugs were found. So plaintiff was driven back to her car and released after being given a summons for passing a stop sign.

**Standards for Summary Judgment**

Under Rule 56(c) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir. 1987). As noted above, for purposes of this discussion the defendants will be deemed the non-moving parties, and where there are different views of the facts, I will assume defendants' version of the facts to be true.

**Plaintiff is Entitled to Summary Judgment as against Individual Defendants Longworth, Bailey and Gelardi on Her Claims for False Arrest/Imprisonment and Illegal Search**

*1. The Defendants are being sued in their individual capacities.*

■ The complaint does not specifically state whether defendants are sued in their official capacities, their individual capacities, or both. The Second Circuit directs a district court to look to the "course of the proceedings" to determine the nature of the liability sought to be imposed. *Frank v. Relin*, 1 F.3d 1317, 1326 (2d Cir.1993). The district court is supposed to avoid disadvantaging a party plaintiff.

■ While defendants claim that the individuals are sued solely in their official capacity, it is obvious that they are not. The plaintiff seeks, *inter alia*, punitive damages against the individual defendants. Punitive damages are only recoverable against municipal employees who are being sued in their individual capacities. *See Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (punitive damages recoverable under § 1983 against governmental officials sued in individual capacities when conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir.1997) (same for § 1981). Defendants' arguments for why that obvious indication of intent to sue the individual defendants in their individual capacities should be ignored are frivolous.

*2. Claim for False Arrest/False Imprisonment*

■ In her first two causes of action, plaintiff alleges that she was falsely arrested and imprisoned. As a practical matter, these two claims merge since, if an arrest was not supported by probable cause, plaintiff's subsequent confinement is automatically unlawful. *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir.1991).

■ To prevail on a claim for false arrest, the plaintiff must prove that (1) the defendant intended to confine or arrest the plaintiff, (2) the plaintiff was conscious of

the confinement, (3) the plaintiff did not consent to the confinement, and (4) the arrest was not otherwise privileged (i.e., the arrest was not supported by probable cause). *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995). In addition, each individual sued needs to have had personal involvement in the arrest in order to be held liable under 42 U.S.C. § 1983. *See Colon v. Coughlin*, 58 F.3d at 873.

The undisputed evidence shows that the officer who put plaintiff under arrest was Lt. Gelardi. She did so at the behest of Chief Longworth and Det. Bailey. Sgt. Spedaliere and Police Officers Chirico, Mahoney and Conlin were on the scene. Chirico was Bailey's partner and participated in the tail; Mahoney had actually stopped plaintiff's car for an alleged traffic violation; and the other three officers were simply present.

*Plaintiff Was Placed Under Arrest*

In what has to be the single most ludicrous argument ever made to me during my ten years on the bench, defendants argue (in connection with their own motion for summary judgment) that plaintiff was not arrested—she was merely subjected to a so-called Level 3 "forcible stop and detainer" under *People v. De Bour*, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976).

██ An "arrest" occurs whenever a reasonable person in the plaintiff's position, innocent of any crime, would not believe that he/she was free to go. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *People v. Yukl*, 25 N.Y.2d 585, 307 N.Y.S.2d 857, 256 N.E.2d 172 (1969), *cert denied*, 400 U.S. 851, 91 S.Ct. 78, 27

L.Ed.2d 89 (1970). The standard is objective, not subjective.

A reasonable person who has been stopped on the street, removed from her car, frisked, handcuffed in the absence of any need to prevent a struggle, placed in the locked back seat of a police car, and driven to a police station could not possibly think that she was free to go. Therefore, plaintiff was under arrest. *Res ipsa loquitur.*

Although the subjective belief of the individuals involved is not relevant, the police officers involved in this situation are under no illusions about what happened—every single one of them described what happened to plaintiff as an "arrest." (Gelardi Dep. at 69, 77; Longworth Dep. at 110; Bailey Dep. at 264–65 ("voiding arrest").)

This ruling makes the legal arguments in defendants' moving brief—all of which are predicated on the absurd notion that plaintiff was subjected to a Level 3 *De Bour* detainer—completely beside the point. The reasonable suspicion that would support a DeBour detainer is less than probable cause, and so would not support an arrest.[3]

*Probable Cause to Arrest Plaintiff Was Lacking*

██ A warrantless arrest made without probable cause to believe that a crime has been committed is unlawful. *United States v. Fisher*, 702 F.2d 372 (1983); *Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circum-

---

**3.** Frankly, if the point were before me, I would conclude that the police did not have reasonable suspicion to detain plaintiff once she produced the pawn shop ticket that validated her story of being in Manhattan rather than the Bronx.

stances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested. *Sarnicola v. County of Westchester*, 229 F.Supp.2d 259 (S.D.N.Y.2002)(citing *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990)). The burden of establishing the existence of probable cause rests with the police, who must establish that there was a "quantum of evidence which amounted to 'more than a rumor, suspicion or even a strong reason to suspect.'" *Id.*, at 375. The factors relied on by the arresting officer must not be susceptible to an innocent or ambiguous explanation. *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *Flores v. City of Mount Vernon*, 41 F.Supp.2d 439, 442 (S.D.N.Y.1999)

In this case, the issue is not even close. The Dobbs Ferry police lacked probable cause to arrest plaintiff.

Chief Longworth, who ordered plaintiff's arrest, described the basis for "probable cause" as follows:

> The Department had received information from two reliable confidential informants that Linda Travis had been making trips on Fridays during the day to a known narcotics prone location at [183rd] Street and Loring Place in the Bronx. It is a location from which this Department has followed numerous persons purchasing cocaine and arrested them and a location which the Greenburgh Police Department has also followed numerous persons who purchased cocaine who incidentally arrested them and found and recovered controlled substances. The informants have been proven reliable in the past, as their information has led to at least five purchases of controlled substances by undercover police officers and five arrests for possession of controlled substances preceding this particular event.

> One of the informants advised us that the reason she had the information about Travis going to buy the cocaine is that she had personally accompanied her on several occasions and observed her make the purchases of cocaine under circumstances described and then traveled back to the Village of Dobbs Ferry.

> On the day in question, it was in fact a Friday, Detective Guarnieri saw Linda Travis filling her car with gasoline and head south on the Saw Mill River Parkway. Detective Bailey later made contact with Linda Travis on the New York State Thruway in the area of the Fordham Road exit, which is several hundred yards—let me qualify that. It's maybe a quarter mile from [183rd] Street and Loring Place. Detective Bailey then followed her back towards the Village of Dobbs Ferry and lost her in the City of Yonkers. Shortly thereafter, she entered the Village of Dobbs Ferry and was stopped by one of our patrol vehicles.

> When questioned by the investigation officers, she lied about where she was coming from. Additionally, it was reported to me that a search of her vehicle revealed there was no controlled substances, that her pants were unbuttoned and that her shirt was up a little bit. When she motioned up, her shirt went up. The shirt was up to some degree and then it went up more when she leaned back or whatever it was.

> All of those facts, accompanied by my 21 years of police experience and training and having personally participated and supervised hundreds of narcotic arrests made me reasonably believe that Linda Travis was in possession of controlled substances on this date . . . .

I spoke of her lying during the car stop, right? She goes to a location during the time and date described. The informant tells us she is in a position to see her actually do this. She tells us how she gets the information. It was independently corroborated by 'Bailey seeing her come from the location on the date in question. I may be missing something, but it is a pretty good synopsis of my probable cause.

(Longworth EBT at 179–182.)

The first—and only arguable—basis for probable cause in this case is the information received from an informant. As noted above, for purposes of deciding plaintiff's motion, I am assuming the defendants' version of the facts. Therefore, I assume that the informant gave the police the information.

I recognize that the informant[4] testified at her deposition that she did not give the police any information about plaintiff until after plaintiff was arrested on January 18, 2002. She has subsequently recanted her testimony. Plaintiff urges me to find her "unreliable" on this basis. For purposes of this motion, however, I decline to get involved in the parties' debate over the reliability of Campana as an informant. I accept as true Bailey's version of events—both that Campana gave the police information about Travis, and that the information was as stated in Bailey's November 17, 2001 report. I also accept as true Chief Longworth's statement that information received from Campana had resulted in several other arrests prior to January 18, 2002.

All that, however, is of no moment. Campana's information was two months old on the day of plaintiff's arrest. The police had been watching Travis for eight consecutive Fridays. They saw nothing at all to corroborate Campana's story. While facts of past criminal activity that by themselves are too stale can be sufficient if the facts establish a pattern of continuing criminal activity rather than a one-time isolated action, *see United States v. Wagner,* 989 F.2d 69, 75 (1993); *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985); *United States v. Barlin,* 686 F.2d 81, 87–88 (2d Cir.1982), in this case the police saw nothing to corroborate any "pattern of continuing criminal activity."

▮ Had the officers applied for a search warrant after stopping Travis's car, a judge considering the application would have been hard pressed to authorize a search solely on Campana's sketchy and stale information. While there is no bright line rule for staleness, the facts supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past. *Compare Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932) (undercover alcohol purchase at hotel twenty-one days prior to application for warrant too remote in time), with *United States v. Beltempo,* 675 F.2d 472, 476–79 (2d Cir.1982)(search warrant not stale when object sought was trace sample of heroin observed spilled on rug fifty-two

4. Chief Longworth spoke of "two" reliable informants. The only informant discussed at length by the parties is Carol Campana. The second informant is purportedly Campana's boyfriend Bobby Martino. According to Chief Longworth (the only person who discussed Martino), all Martino did was "corroborate" Campana's tip. The nature of his corroboration is not revealed to the Court, and there is no mention of a "Mr. Martino" in the Dobbs Ferry Police Department paperwork provided as exhibits. At his deposition, Chief Longworth testified that Martino's information "wasn't critical" and that he would have authorized the arrest even without Martino's corroboration. Longworth EBT at 292–93.

days prior to issuance of warrant), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982).

But while Campana's tip, without more, does not give rise to probable cause, it could have supported a lawful arrest if augmented or corroborated by something incriminating that happened on January 18, 2002. When one examines the factors cited by Chief Longworth as going into his decision to order plaintiff's arrest, it is clear that no such augmentation or corroboration occurred.

**Buying Gasoline:** Chief Longworth testified that one factor in his decision was plaintiff's purchase of gasoline. Buying gasoline is not a crime, and nothing could be more susceptible of an innocent explanation than filling a gas tank. I am sure that, as the Chief testified, drug dealers fill their gas tanks. So do doctors and lawyers and teachers and investment bankers and soccer moms—and police chiefs and even federal judges.

Besides, Lt. Guarneri did not tell Chief Longworth that plaintiff was buying gas. He told the Chief that Travis was at the Getty/Mini–Mart. Perhaps she stopped for a cup of coffee, or a donut, or a candy bar or some gum—none of which the chief has linked to criminal intent. As plaintiff points out, this small difference between what the Chief was told and what he allegedly relied on suggests that, where facts to support probable cause were missing, Longworth was capable of making them up—or, more likely, drawing inferences

that fit his own preconceived notions about what was going on.

**Driving into and out of New York City at mid-day on a Friday:** Plaintiff was incontrovertibly in New York City in the middle of the day on January 18, 2002. She admitted as much to the police; when asked to account for her whereabouts she produced a claim check from a Manhattan pawn shop.

She was even in the Bronx. Assuming the facts in the manner most favorable to defendants, Bailey and Chirico saw her car on Interstate 87 at or near the Kingsbridge entrance ramp, where they stationed themselves.[5] The court takes judicial notice of the fact that a stretch of I–87 known as the Deegan Expressway runs through the Bronx between Westchester County on the north and the Bruckner Expressway/Triborough Bridge on the south. The Kingsbridge Road entrance ramp is just north of Yankee Stadium, beyond the entrance ramp leading to 178th Street and the George Washington Bridge. And I will accept, for purposes of this motion, that the entrance ramp where the officers were when they spotted plaintiff's car is between a quarter and a half mile— or not very far—from the site where Campana said plaintiff went to buy drugs.

But being in the Bronx is not enough to give rise to probable cause. Plaintiff offered Bailey an innocent explanation for her presence in New York City—a visit to a Manhattan pawn shop. She even dis-

---

**5.** Plaintiff is accepting defendants' version of the facts as true for purposes of this motion. So her version of events is irrelevant. In the interest of completeness, I should note that plaintiff denies being on the Deegan at all. Her story is that she took the Saw Mill to the Henry Husdon Parkway and went across the Half Moon Bridge directly into Manhattan, where she went to the pawnshop and returned via the same route. When she left Dobbs and when she returned to Dobbs, she

was alone in her car. There is potential corroboration for plaintiff's story in Detective Bailey's evidence. According to Bailey, there were two people in the maroon Volvo that they followed up the Deegan, onto the Saw Mill and into Yonkers. But when plaintiff left Dobbs Ferry and when she returned and was stopped, she was alone in her car. It is actually possible that Bailey and Chirico were following someone else's maroon Volvo up the Deegan and into Yonkers.

played proof, in the form of a date-stamped claim check, to corroborate her story. Plaintiff's presence on the Deegan Expressway is completely consistent with that story. If a person who lives in western Westchester County happens to be in New York City, she can select one of three different north-bound routes—the Henry Hudson Parkway, Broadway, or the Deegan Expressway—to reach the Saw Mill River Parkway, the north-south artery that gives access to the River Towns (of which Dobbs Ferry is one). Many people come home from Manhattan on the Deegan Expressway. It is a popular choice.

And here it becomes significant that Bailey and Chirico *did not see either plaintiff or her car anywhere except on the Deegan!* They did not know where plaintiff went when she drove south on the Saw Mill because they were miles behind her when they took up the chase. And when they went to the neighborhood where Campana said plaintiff went to buy drugs, their canvass did not reveal anything consistent with the informant's story. They did not see plaintiff in the area, and they did not see her car in the area. They have no idea where the red Volvo got onto the Deegan, because when they saw the car it was going at highway speed in the middle lane. Chief Longworth's assertion that plaintiff went "to a location" (by which he meant the location identified by Campana, 183rd and Loring Place) is not supported by any evidence at all. If anything, it is contradicted by the evidence! [6]

If Bailey and Chirico, having received Campana's tip, had seen plaintiff in the vicinity of 183rd and Loring, or seen her car parked on the street in that area, and if she had denied being in that area when Bailey questioned her about her whereabouts, there would have been probable cause to arrest her, even though they did not see any crime being committed. Perhaps if they had seen her getting onto the Deegan at an entrance close to 183rd and Loring Place (the Fordham Road entrance being the closest), they might have had some reason to be suspicious. But on the facts as attested by defendants, the police had no basis to do anything more than ask Travis where she had been. Once she offered an innocent explanation for her presence on the Deegan Expressway in the Bronx, and corroborated that explanation with proof, they should have backed off and investigated her claim—or tried to do a better job of surveillance the next time.

**Plaintiff's Lies When Stopped:** I do not doubt that Chief Longworth believes plaintiff lied when she said she was at a Manhattan pawn shop, not a drug-prone location in the Bronx. Unfortunately, on January 18, 2002, he had no evidence to support his belief—only a suspicion. While the police had been told, two months earlier, that plaintiff was known to go to 183rd and Loring on Fridays, the Chief had absolutely no information placing plaintiff at that location on January 18. Plaintiff had provided the police with evi-

---

**6.** The court has had an interesting time trying to figure out the geography of this case. Det. Bailey (who was, after all, the man in the police car) said that he and Chirico stationed themselves on the Kingsbridge Road entrance ramp to the Deegan, from which they saw plaintiff's car in the middle lane of the highway going north at highway speed. That means plaintiff got on the Deegan somewhere south of the Kingsbridge Road entrance ramp. 183rd Street and Loring Place is south of the Kingsbridge Road entrance ramp, but it is well south of Kingsbridge Road, but so are many other places, including the entrance ramp that would be taken by someone who is starting home from Manhattan. (Just to give this a little twist, Bailey's complaint report placed the RMP on the shoulder of I–87 just north of Fordham Road, which is south of the Kingsbridge Road entrance ramp. I accept Bailey's sworn deposition testimony on this point for purposes of this motion).

dence that she was elsewhere. Nothing the police knew about her movements or location on the relevant date suggested that her explanation was untrue. Therefore, her "lies" added nothing to the probable cause equation.

**The Condition of Plaintiff's Clothes:** Finally, the Chief (and Det. Bailey) placed great emphasis on the fact that plaintiff's top pants button was unbuttoned and her shirt hiked up when she moved.[7]

All I can say is, the Chief must not wear womens' clothes very often. As plaintiff's counsel observes, there are quite a few innocent explanations for an open top button. The court knows from personal experience that a woman might unbutton her top pants button while driving (1) because the car's seat belt was pressing the button into her midriff; (2) because she had just eaten; (3) because her pants were too small (the undisputed evidence is that plaintiff was wearing a pair of tight jeans); and (4) because she was in such a hurry after using the facilities that she did not "zip up" properly (this happens to men, too). Similarly, it has been the fashion for some years for young women to wear tops so tight that they ride up whenever the wearer presses up against something, as the driver of a car presses up against the back of the seat. Thus, there are more than sufficient "alternative innocent explanations" for the condition of plaintiff's clothes.[8]

In sum, no reasonable trier of fact could conclude that the police had probable cause to arrest plaintiff on January 18, 2004. Plaintiff is entitled to a judgment of liability on Counts 1 and 2.

The question then becomes: against whom is she entitled to summary judgment, under the "personal involvement" doctrine? Plaintiff's unfortunate tendency to lump all the defendants together cannot be countenanced at this stage. For a defendant to be held liable to plaintiff on this claims, plaintiff needs to demonstrate that he or she was personally involved in the arrest.

Plaintiff is clearly entitled to summary judgment against Lt. Gelardi (the arresting officer), Chief Longworth (who authorized the arrest) and Det. Bailey (the Chief's point man on the scene).

■ I cannot, however, grant plaintiff summary judgment against any of the other officers who were present at the time of her arrest. Indeed, I must dismiss her false arrest/false imprisonment claim against all the other individual defendants except Mahoney.

■ While an officer can be held liable for his role as a "back-up officer," or for failing to stop another officer's violation of a person's Fourth Amendment rights, (*see e.g., James by James v. Sadler,* 909 F.2d 834 (5th Cir.1990)) (finding that "backup officers" who remained armed on a premises during a search and guarded detained customers outside a shop while a search proceeded inside, but did not physically perform the search of the plaintiff, were not bystanders because they were "integral to the search"), the record does not make it clear that any of these other officers present at the scene was integral to plaintiff's arrest and subsequent strip search. Nor were these officers in any

---

**7.** It can get awfully cold on January 18 in this part of the world. In fact, most people wear coats on January 18. Coats tend to cover the waistband of pants, and completely obscure blouses. But of course this observation would go to the credibility of Detective Bailey, which is not at issue on this motion. I am assuming that every word he said at his deposition is true.

**8.** I note that none of the contemporaneous police reports contains any notation that plaintiff's clothes were disarranged, or that her button was open.

position to stop the arrest and strip search that had been authorized by their Chief.

All the officers have moved for summary judgment. This made it incumbent on plaintiff to provide evidence to support her claim that they were personally involved in her arrest or evidence that they were in a position to stop the illegal arrest and failed to do so. Chirico's participation in the tail did not violate her constitutional rights; neither did Mahoney's and Conlin's consent search of the vehicle, or Spedaliere's supervision of the same. There is no evidence that any of these officers played a role in plaintiff's arrest or were in a position to stop it. Therefore, the false arrest/false imprisonment claim is dismissed as against Chirico, Conlin, and Spedaliere.

■ Because Mahoney stopped plaintiff's car, which led to the questioning, frisk, car search, and ultimate arrest and strip search of plaintiff, there are disputed issues of fact concerning the stop that preclude summary judgment for either Mahoney or plaintiff on the false arrest/false imprisonment claim against Mahoney. This will have to go to trial.

### Plaintiff Was Illegally Strip Searched.

■ Because there was no probable cause to arrest plaintiff, there was no basis to subject her to a strip search. If the arrest is illegal, any search incident to that arrest is illegal. *Flores v. City of Mount Vernon,* 41 F.Supp.2d at 444. As in *Flores,* defendants certainly suspected that plaintiff was carrying contraband, but their suspicions were not corroborated by any facts.

■ The Second Circuit held long ago that investigatory post-arrest searches, undertaken to locate evidence that would support a charge, are unconstitutional. *Rivera v. United States,* 928 F.2d 592, 606–607 (2d Cir.1991). The strip search of Linda Travis was a post-arrest investigatory search, plain and simple. It was under-

taken in the hope that the discovery of contraband would corroborate the officers' hunch that she might be carrying drugs. Strip searches may not be performed on the basis of mere suspicion or for investigatory purposes in the hope of recovering evidence that will corroborate a hunch.

Plaintiff is entitled to summary judgment against Lt. Gelardi, Det. Bailey and Chief Longworth on her illegal strip search claim. There is no suggestion that any of the other officers was involved in this search. Therefore, under the "personal involvement" rule of Section 1983, the Fourth Amendment/strip search claim is dismissed as to all other defendants.

### The Officers Are Not Entitled to Qualified Immunity

■ Longworth, Bailey and Gelardi argue that, even if the arrest and subsequent search were unlawful, they are entitled to qualified immunity because at least arguable probable cause existed to arrest and search plaintiff, pursuant to the doctrine announced by the Second Circuit in *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) and *Cerrone v. Brown,* 246 F.3d 194, 201 (2d Cir.2001).

■ Even violations of clearly established constitutional rights may be shielded by qualified immunity if it was objectively reasonable for the public official to believe that his acts were lawful. And when police activity involving "probable cause" is the issue, the officers will be entitled to qualified immunity "when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well established law." *Cerrone v. Brown,* 246 F.3d at 199 (quoting *Lee v. Sandberg,* 136 F.3d at 102).

I reject categorically defendants' argument that any reasonable police officer in

the circumstances of this case could have reasonably believed that probable cause to arrest existed in light of well established law. Indeed, if the doctrine of "arguable probable cause" could be stretched to shield this purely "investigatory" arrest from the reach of Section 1983, then I submit that the protection against false arrest and imprisonment afforded our citizens by the Fourth Amendment would be severely eroded. And in light of *Rivera v. United States*, 928 F.2d at 606–607, no reasonable police officer, having only the paucity of information available to defendants, could have reasonably believed that it was constitutional to strip search Travis.

This court has had the misfortune to deal with a number of "investigatory arrest" and "investigatory strip search" cases since coming on the bench. The facts of this particular case are as outrageous as any I have seen. The behavior of the defendants was completely unreasonable. Longworth, Gelardi and Bailey are not entitled to qualified immunity.

■ If the facts are as alleged by plaintiff (which I must assume in deciding a motion for qualified immunity), then no reasonable officer in Mahoney's position could have believed that he was authorized to stop plaintiff. If, however, the facts are as Mahoney asserts, he had a reason to stop plaintiff. This matter will have to abide a trial.

## *Monell* Claim Against the Village of Dobbs Ferry

■ The Village of Dobbs Ferry (the "Village") has moved for summary judgment dismissing the claim against it. The Village obviously cannot be held liable for the acts of Longworth, Gelardi and Bailey on a theory of respondeat superior. *Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Asserting a *Monell* claim against the Village, *see Monell v. Department of So-cial Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), plaintiff claims that she was searched pursuant to an illegal and unconstitutional strip search policy in force in the Village. That policy states as follows:

Members of the Department shall limit strip searches of defendants to the following situations:

1. When the circumstances surrounding the crime committed are such that the arresting officer has reasonable suspicion to believe that the arrestee is concealing a weapon or other contraband.

2. When the arresting officer can substantiate the search based upon reasonable suspicion, which is relative to the crime charged, the particular characteristics of the arrestee and/or the circumstances of the arrest.

(P. Exh. S).

■ The problem with plaintiff's *Monell* claim is that she was searched IN VIOLATION OF the Village's policy. The policy is constitutionally compliant on its face. It limits strip searches to situations where an arresting officer has reasonable suspicion to believe that the subject is carrying contraband. The standards to be used by the officer in making that assessment are the very standards set forth by the United States Court of Appeals for the Second Circuit in *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988), *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir.1994) and *Shain v. Ellison*, 273 F.3d 56 (2d Cir. 2001). Plaintiff is incorrect in asserting that the policy is unconstitutional on its face because it does not distinguish between felony and misdemeanor arrests. Under Second Circuit jurisprudence, any person detained, whether for a felony or a misdemeanor, can be strip searched as long as the police harbor a reasonable

suspicion that the detainee is carrying contraband.

Here, however, just as there was no probable cause to arrest plaintiff, there was no reasonable suspicion to believe that she was carrying contraband. There was only stale information that she sometimes went to a particular neighborhood in the Bronx on Fridays to purchase drugs, an apparent sighting of her car on a major interstate highway in the Bronx (but not the neighborhood where she ostensibly purchased drugs), and proof that she had been in Manhattan earlier in the day. The two month old "tip"—which in truth provided the entire basis for the strip search, because it predisposed Chief Longworth and Det. Bailey to believe that plaintiff must have been on a drug run—was not specific to the date in question and had not proved correct for eight consecutive Fridays after it was given. The police had no specific information about what plaintiff would do on January 18. An individual's presence on a highway in the Bronx does not give rise to reasonable suspicion of any illegal activity, because there are many reasons why she might be driving in the Bronx. If the officers had tailed plaintiff and could place her in the neighborhood described by the tipper on January 18, or if they had called the pawn shop in Manhattan and learned that the ticket was a phony and that no one matching plaintiff's description had been there that day, reasonable suspicion to search her, and even probable cause to arrest her, might well have existed. Reasonable suspicion was lacking, however, on the facts of this case.

This means that Chief Longworth, Lt. Gelardi and Det. Bailey violated their own policy by strip searching plaintiff. Since *Monell* claims are predicated on illegal activity committed pursuant to a policy or practice, no *Monell* claim can lie against the Village for a strip search that violated policy.

■ Nor does the fact that Chief Longworth—the Police Department's highest policy-maker—authorized the search make it "pursuant to policy." While even one action by a chief policy maker can constitute a "policy" for *Monell* purposes, (*see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)), not every action of a chief policy maker automatically becomes "policy" for *Monell* purposes. This case is the paradigmatic example of that proposition. Longworth had already made a policy concerning strip searches. He then violated his own policy by authorizing a strip search in the absence of reasonable suspicion to believe that Travis was carrying contraband.

The only other way Dobbs Ferry could be held liable is if plaintiff adduced evidence showing that the Dobbs Ferry Police Department routinely strip searches individuals without reasonable suspicion of contraband carriage. But there is no such evidence in the record. Indeed, there is no evidence in the record before me about any strip search except the strip search of plaintiff. That puts this case squarely in the category of cases where we are dealing with a single incident of unconstitutional activity that is not attributable to an existing, unconstitutional municipal policy. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). The fact that it is a particularly outrageous incident does not make the Village liable for it—though it may make the offending officers liable to plaintiff in punitive damages.

The defendant Village of Dobbs Ferry's motion for summary judgment dismissing the Section 1983 claim against it is granted.

**Claim for Intentional Infliction of Emotional Distress**

In her fourth cause of action, plaintiff sues all defendants for intentional infliction

of emotional distress. This claim lies against the Village of Dobbs Ferry as well as the individual defendants.

■ The court recognizes that intentional infliction of emotional distress is, of course, disfavored under state law. *See Martin v. Citibank*, 762 F.2d 212, 220 (2d Cir.1985) (New York courts have very strict threshold for the tort of intentional infliction of emotional distress); *Fischer v. Maloney*, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978) (tort of intentional infliction of emotional distress is highly disfavored under New York law, and recovery is limited to cases where defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society"); *see also Howell v. New York Post*, 81 N.Y.2d 115, 119–20, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). However, in particularly outrageous cases, it is a viable claim.

■ The facts of this case are so outrageous that this is the rare case in which I cannot dismiss the intentional infliction of emotional distress claim as a matter of law on a motion for summary judgment—at least not against the Village of Dobbs Ferry, Chief Longworth, Lt. Gelardi or Det. Bailey. The evidence before the court does not suggest that any of the other defendants (including Mahoney) perpetrated such outrageous acts against plaintiff as to make them personally liable under this highly disfavored theory, and the fourth cause of action is dismissed as against them.

## Summary of Ruling

I grant the following motions for summary judgment:

■ For the Village of Dobbs Ferry [9] dismissing Count Three.

For individual defendants Chirico, Conlin and Spedaliere, dismissing the complaint in its entirety.

For plaintiff, granting judgment of liability against defendants Longworth, Gelardi and Bailey on Counts One and Two. Insofar as Count Three is alleged against the individual defendants, it merely duplicates Count Two, and so is stricken as surplusage.

All other motions for summary judgment are denied.[10]

## Further Proceedings

The issues that remain to be tried are (1) liability for false arrest/false imprisonment as against Police Officer Mahoney; (2) liability for intentional infliction of emotional distress as against the Village of Dobbs Ferry, Chief Longworth, Lt. Gelardi and Det. Bailey; (3) compensatory damages against the Village of Dobbs Ferry, Chief Longworth, Lt. Gelardi, Det. Bailey and (if he is held liable for false arrest) P.O. Mahoney; and (4) punitive damages against the individual defendants (but not the Village of Dobbs Ferry).

The parties are directed to come in for a settlement conference before the Hon.

---

**9.** It is redundant to sue both the Village and its Police Department. When the Police Department is sued, the Village is the actual defendant. I therefore dismiss as surplusage the claims against the Dobbs Ferry Police Department.

**10.** Notwithstanding the proclivity of plaintiffs' lawyers to plead punitive damages as a cause of action, it is not a cause of action. It is a remedy available for certain violations of law. Plaintiff's Fifth Cause of Action for punitive damages is dismissed, with the caveat that plaintiff may submit to the jury the issue of punitive damages against any individual defendant who has been or who may yet be found liable to her on Counts One, Two, Three or Four.

Lisa Margaret Smith on February 28, 2005 at 11:00a.m. A representative of any carrier involved must be *physically present* (i.e., in the room, not available by telephone) at the conference.

The parties are advised that the Court plans to put this matter on its trial calendar at the first available opening.